United States District C o u r t
Southern District of
Indiana

Indianapolis
Division

FILED
U.S. DISTRICT COURT
INDIANAPOLIS DIVISION

2016 APR 22  PM 4: 53

SOUTHERN DISTRICT
OF INDIANA
LAURA A. BRIGGS
CLERK

Kristin S. Hill,

      Plaintiff

    v.

## 1 : 1 6 -cv- 0 9 1 6 JMS -DKL

Bayside Woods, HOA Inc.

Community Association Services of Indiana

Paylease Web

Eads, Murray and Pugh, P.C.

      Defendants

## **COMPLAINT**

Plaintiff, Kristin S. Hill, in person, in support of her Complaint states as follows:

1. Kristin S. Hill was at all times and still is an individual who is a resident of Marion County in Indianapolis, Indiana.

2. Defendant, Bayside Woods, HOA  is located at 11711 N College Ave #100 in Carmel, Indiana and has been in the business of Homeowners' Association. Defendant, Paylease Web, provides online payments, resident billing and utility expense management tools to HOAs and property management companies. Defendant, Community Association Services of Indiana provides a vast array of maintenance

services and resources for Indiana. Defendants Eads, Murray and Pugh, P.C. are Bayside Woods Homeowners attorneys.

## Jurisdiction

3. Jurisdiction of this Court is invoked pursuant to 15 § U.S.C. 1692e (2) and 15 § U.S.C. f (1).

## Facts

4. Robert Ritter ("Ritter") purchased a condominium at 6412 Bay Vista Court in Bayside Woods on or about March 16, 2012. Prior to the closing Mr. Ritter was provided a copy of the Declaration of the Covenants, Conditions & Restrictions at Bayside Woods. Shortly after the closing Mr. Ritter's daughter moved her belongings into the condo but she did not occupy the condo until late in May of 2012 and no one else has lived in the condo since Ritter purchased it.

5. On April 23, 2012 the Bayside Woods Homeowner's Association ("Association") sent Ritter a letter stating that their BBQ grill had damaged the siding of the building around the patio area and therefore it was their responsibility to have it repaired.

6. After receiving the letter when she moved in towards the end of May, Hill contacted the community manager (Meredith Reese ("Reese")) to inform her that the BBQ grill on the patio was not theirs; it was left by the prior owner and that she nor anyone else had occupied the condo at the time the letters were sent to her. After discussing it further with Hill, Reese asked her to put in writing what they had discussed and email it to her so she could raise the issue at the next Board of Directors ["Board"] meeting. Hill responded as follows:

"This letter is in response to the letters we have received from the Association in reference to the section of the siding on the building that the Association stated was damaged by our BBQ grill. However, as we have discussed, the BBQ grill that was on our patio was not ours and we did not caused the damage. The BBQ grill was on the patio at the time we first looked at the condo and the seller did not remove it by the time we closed as we were told he would. Eventually someone helped me move it to the front of the condo for trash pick-up. At no time did we use the BBQ grill. In fact no one even lived in the condominium until after we received the first letter from you in May 2012. Therefore we are not responsible for repairing the siding of the building because the Association is responsible for the upkeep of the outside of the building and we did not cause the damage. In addition it is not apparent to me that the damage was caused by the grill as I have seen several other condominiums that have the same type of damage only not as bad or much worse and none of them had a BBQ grill in the area and some had damage to the siding in an area where it was highly unlikely that to have been caused by a BBQ grill. If you have any questions please contact me…"

7. On September 8, 2012 Hill came home and found that the damaged siding had been repaired and contacted Reese as to what the Board decided and Reese responded, "Sorry for the delay in responding. The Board determined the repair would still be your responsibility. We will be sending you a letter shortly with the information; if you are in disagreement you are certainly welcome to petition again. After another discussion with Reese, Reese replied by email:

"The damage is the owner's responsibility. Whether yours or the prior owner, it will be your responsibility to take care of. You are welcome to petition the prior owner regarding this damage. Was it no identified in your inspection report? As for the Board, yes the decision was unanimous."

On October 24, 2012 the Association sent Ritter an invoice for $355.48 and a letter on October 29, 2012 stating:

"Enclosed is Invoice 94967 for a CASI maintenance service call to replace the siding damaged by the heat of a BBQ grill. Since the issue was deemed an "owner responsibility" the Association is not responsible for payment of

this service.  The total amount due is $355.48.  This charge as been applied to your homeowner account…"

8. Hill petitioned citing Article X.   Maintenance, Section 3.   Exterior Maintenance, Obligations of Association with Respects to Lots of the Declaration of Covenants, Conditions and Restrictions "(Declaration)":

> "In addition to maintenance upon the Driveway Easements, the Association shall provide exterior maintenance upon each lot which is subject to assessment hereunder, as follows: paint, repair, replace, and care for roofs, gutters, downspouts, exterior building surfaces and other exterior improvements…In the event that the need for maintenance or repair is caused through the willful or negligent act of the owner, his family, guests, or invitees, the cost of such maintenance or repairs shall be added to and become a part of the assessment of which such Lot is subject."

and stating:

> …According to the emails Meredith ["Reese"] and the letter the Association sent to me, the Association determines only that it is "an owner responsibility" and that it is our responsibility to petition the prior owners…The Association has not provided any reasonable basis for its conclusion that we are responsible for the costs of repairing the damage regardless of whether we caused the damage or even that the damage was caused by a grill.  If the Association believed that the prior owners did cause the damage the Association had the opportunity to notify them of the damage and repair it at their expense if they did not challenge that the damage was caused by their grill or repair it but they didn't…"  I will mail an Affidavit next week stating that we did not cause the damage and therefore are not responsible for the expenses to repair it, although [Reese] indicated that wasn't the issue in her email on November 6, 2012. Therefore, it cannot be concluded that we are responsible…"

On November 27, 2012 Hill sent a notarized affidavit to Reese stating that "No one had occupied the condominium at 6412 Bay Vista Court before the Association sent us a letter on April 23, 2012 notifying us of the damage to the side of the building in the patio

area of the condominium that it believed was caused by our BBQ grill and at no time had

I, the owner, a family member, guest or invitee even used the grill…".

The Association responded simply stating:

> "At the last monthly meeting on November 20, 2012 the Board reviewed
> your dispute related to the charge for siding damage, and it was decided
> that the original decision stands and you, as the homeowner, are
> responsible for the repair cost of $355.48. We appreciate your asking for
> another appeal;, however, this decision is final and the charges stand as
> originally submitted.  Please make check payable to Bayside Woods
> HOA…no later than December 14, 2012…."

Other sections of the Declaration clearly provide that the Association is responsible for

the upkeep of the exterior portions of the buildings and that special assessments assessed

for the cost of repair do not transfer from seller to buyer unless expressly assumed by

them. ( Article III, Sec. 1, Article VIII, Section 8, Article X, Section 3..) The seller and

Ritter did not make any such agreements and the Account History report does not reflect

that any "special assessments" were transferred from the seller to Ritter's Account

History.

9.   After Hill petitioned the Association she received numerous letters reminding her and

Ritter that the Account History had a past due balance.

10. In October, 2014 she received a letter from Community Association Services of Indiana

stating:

> "By your signature below, this letter shall constitute your agreement to
> bring your account with Bayside Woods, HOA, Inc. in accordance with
> the stated terms.  Please sign and date as indicated and return this letter to
> us.  A copy of this agreement is enclosed for your records."

> "I agree to bring my account current with Bayside Woods, HOA, which I
> acknowledge is past due as this letter in the amount of $519.21.  The terms
> of the agreement are as follows:

I understand that my failure to comply with these terms will result in the revocation of this payment plan by the Board of Directors, in which case collection proceedings shall immediately commence."

After receiving this letter, Hill called the Association office and questioned the balance due stating that it should only be in the amount of the $355.48 [or little Less which is the amount of the disputed charge for the repair of the damaged siding and the lady she spoke with told her it was just a glitch and agreed that that was not accurate.

11. On October 29, 2014 Ritter received a letter from the President and CEO, Community Association Services of Indiana stating:

"It has come to our attention that you may have recently received a letter indicating that your account was delinquent and included a request to set up a payment plan. Please note this letter was mistakenly sent to your attention.  As such, please disregard the letter you received. Please see a copy of the correct letter that should have been sent to you previously. We sincerely apologize for this inconvenience ..."

On the reverse side of the page was a letter informing Ritter of the appropriate payment methods which were listed as Autopay;  paying online 24/7 and payments by mail to the Arizona office addressed to Bayside Woods HOA, Inc.  Prior to receiving the letter Hill had deposited a money order for the monthly assessments in the deposit box outside of the Carmel, Indiana office building or on occasionally deposited a check in the deposit box. At the time she began paying online – December of 2014 – she was one payment behind because she was unable to get into the website to

make the payment but a lady with the website took care of it either through the Association or through Paylease Web but she made two payments at that time and had only a balance of $351.59 which was just under the amount of the charge she disputed they owed. One of the payments was returned NSF but it was due to her not knowing that if she made a deposit to cover the payment by a check from her father after 11pm that day, it would not clear her bank for 2 days. She did though remake the payment online at the time she made their January payment.

12. At that same the Association began adding monthly late fees onto their Account History Report due to the unpaid special assessment for the repair of the damaged siding. Prior to the making the payments online as a method of making payments – or mailing them to the Arizona office or using Autopay – as she was asked to do, Ritter was not charged a late fee for non-payment of the special assessment for the repair of the damaged siding.

13. On April15, 2014 Hill attempted to pay the April monthly assessment online but the computer automatically took the entire balance for deduction from her bank account without having given her an opportunity to confirm or not confirm the payment. Thinking she had missed some of the steps for making the payment that normally came up on the computer she tried to cancel the payment and after numerous attempts a notation came up on the computer asking if she wanted to cancel the transaction and she responded that she did. Then a notation came up stating that the transaction had

been cancelled and she tried again to make the payment for only the monthly assessment but the steps to make a payment for anything other than the full balance did not appear on the online payment web site and again a notation that a payment in the amount of $476.40 had been successfully made and a confirmation number for it but again with no opportunity to confirm or not confirm that payment. Normally she has to click on "next" to confirm the payment but because the full balance was being presented to her bank for payment rather than the payment she intended to make and the transaction would not cancel, she did not click on "next" to complete the transaction thinking that the payment would not go through.

13. After finding that she couldn't make the payment without the full balance being deducted from her account Hill sent the following email to the Association's web site:

> "I have tried to make my [H]omeowners Association fee payment two times. I am trying to make this month's payment only but this will only allow a payment of $479.00 (think that was the amount) so I tried to cancel it and one of them did but the other one will not. I did not close it out so I do not know where it stands but a cancel choice would not come up despite repeated efforts. This needs to be removed because it will just be sent back from the bank. No choices came up for making a payment of an amount less than the $470 payment. I will call the Texas office tomorrow but this does need to be taken off because I do not want this amount to go through my account. I will try one more method to see if I can get a smaller amount to go through and if it doesn't go through then I will stop. You may run the amount of this month's assessment which is approximately $185.00."

14.                                                                                                    T

he following day Hill contacted the Association office and explained to the community manger what she experienced while trying to make her payment and he told Hill he would transfer her to the accounting department and they could remove

the payment from her account and then she could make the payment again but to call him after she made it and he would remove the late fee. He transferred her and the lady she spoke with initially told her she could take the payments off but and asked her to hold but when she returned she told Hill she was sorry but the computer would not let her take them off. Hill then said that she would ask the bank to dispute it and the lady said "That would probably be best." However, *both* the first payment that the computer noted would be cancelled and the second payment were presented to the bank for payment on April 17, 2014 - and returned for insufficient funds. She also found just a week before filing this that the Association had locked Ritter's account and contacted the Association on April 18, 2016 as to why they would have locked it. She was transferred to the debt collector and he explained that they do that when a case is turned over to an attorney so that the owner cannot go into the online payment center and pay their balance without paying the attorney fees. So she wondered if that was what they were trying to do in April, 2014 when the computer would only allow her to pay the full balance. They had not been turned over to the attorneys at that time but had received a couple letters from the Association indicating their intention to proceed with collection.

15.                                                                                          H

ill banks with Chase bank and after finding that both payments were being presented for deduction Hill went to the bank and reported it. While at the bank she spoke with someone by telephone who told her Chase would dispute the payments and asked if she could fill out the needed information online. Hill responded that she could but later was unable to and was then told that she could just go to a branch and a banker could have

her fill it out.  When she did though, the banker noticed that the payments had been returned for insufficient funds anyway so there would be no need to dispute them and he removed the overdraft fees from her account.

16.                                                                                           O

n April 22, 2014, two $25.00 NSF fees for the returned payments were deducted from her account.  Chase disputed the NSF fees on the basis that Hill did not authorize them to be taken out of her account and the fees were returned to Hill's account as a result of the dispute. Paylease Web, however, notified her by email on April 28, 2015 that the NSF fees did not go through her account which they had but  Paylease Web had to return the funds because she had not authorize them.   However, Paylease Web immediately attempted to run the fees through her bank account and they were presented for payment on April 29, 2015.  She had though, gone into the bank to inform the banker that she was concerned they would do that and he immediately put a restriction on her account so those fees were returned to Paylease Web for insufficient funds. As a result though of Paylease Web having successfully had the fees deducted from her bank account the first time and Chase having had to dispute them to have them returned to her account for lack of authorization run the two NSF fees and then Paylese Web having attempted to run them through her account a second time Chase told her they would have to close out her account and open a new account for her and she would not be able to make any more payments to the Association through them which she agreed she would not do.  Paylease Web though, was aware that she did not authorize the payments in the amount of $476.40 because Paylease Web notified her that the NSF fees were returned to it by her bank by email and Paylease Web did not know her email address

prior to her sending Paylease Web the email stating that the computer would not allow her to make a payment of less than the full balance and she did not intend to pay the full balance and that it would be returned. Yet Paylease continued to run fees through her bank account. (See #16).

17.                                                                                                               N

o notations though were listed on the Association's Account History though, that show Paylease Web tried to deduct the payments from her account and the Association added two $15.00 fees to their Account History because of the returned payments.

18.                                                                                                               A

s a result of the banking problems they had caused for her and Chase, Chase had to close out her checking account and open a new one. All new accounts though, have a $13.00 fee automatically deducted from though every month which her prior checking account did not have so she has a fee that she would not have had had the Association's Web site not tried to take the full balance out from her account without her approval that included the disputed amount of the $355.48 special assessment for the repair of the damaged siding. In addition she had to spend a lot of time going back and forth to the bank trying to get the deductions stopped and she encountered other problems as well. She was involved in an appeal with a deadline for filing during this time which she almost missed due to the fact her bank account was restricted and she couldn't mail the documents without using her bank card after 11PM because the automated Postal machines do not take cash. She also missed the due date for paying a bill because she had planned to pay the bill directly at the store but was held up with something else and couldn't and when she tried to call it in she realized she couldn't do that either. Hill also

has to pay the monthly assessments by money order through the mail but because they go to Arizona and the time it takes to arrive varies they are frequently late. She no longer has the convenience of paying the assessments online because Chase bank asked that she not give her new account number to them. Paying by money order is very inconvenient due to the time it takes to drive to a store to purchase them and then to the Post Office for mailing and she incurs additional cost for certified mailing and return receipts.

19.                                                                                            E

ither the day after or two days later after finding that the first payment attempt hadn't cancelled and both payment attempts had been presented to Hill's bank for deduction she contacted the Association and explained what took place to the community manager. After pulling up her account he said "Well, you have a balance on your account." Then Hill responded that rest of the balance was for the repair of the siding on the building and that she hadn't paid it because they didn't owe it. Hill stated that they didn't cause the damage it; she stated that it was there when they purchased the condominium and therefore it wasn't their responsibility "to take of" under the Declaration. Then he told her that they could take care of it and that she just needed to put it in writing. He said "We just can't do anything unless you put it in writing." Hill told him that she had put it writing two times and the Association had sent her two letters both times stating that regardless of whether or not they caused the damage it was their responsibility to get it taken care of. (See #7 – email from Reese). Then he said responded that there wasn't anything he could do if the Board had made the decision and that she just would have to sue them - but he could transfer her to the accounting department and they could remove the present unauthorized deduction(s)

from her account. Then he told her that after they (the accounting department) removed the present deduction(s) — she doesn't remember at that point whether she knew that the first payment she had made hadn't cancelled as the computer said it did — to make the payment she intended to make and then call him and he would remove the late fee. The accounting department employee though, found that the computer wouldn't let her remove the payment(s).

20.                                                                                                              R

ecalling the conversation with the community manager after recently speaking with the debt collector, Hill is now thinking that it *is* their practice to take only the full balance when a person pays online after the Association has tried unsuccessfully to collect the balance on the account and that is why he pointed out that Hill had a balance on the account at the beginning of our conversation in April, 2015 when she told him that she was trying to pay only the assessment but that the computer wouldn't let her. When Hill discovered just a week before filing this that the account was locked she called attorneys to ask why they locked Ritter's account and explained that she needed information from it and the attorney's assistant said they didn't – that the Association did – so she would have to call them for the answer, which she did and was told that "they lock the account when it is turned over to the attorneys so an owner can't go into it and pay the full balance without paying the attorney fees as well." Hill doesn't know if the Community Manager who made the comment back in 2014 - "Well, you have a balance on your account." - after she told him that she was trying to pay only the monthly assessment but the computer wouldn't let her pay only the monthly assessment - responded as such assuming that the computer was set up to do that or not because the Association now has a new community manager. At that time the balance

listed on the account was only a few dollars over the amount charged to Ritter for the repair of the damaged siding.

21.

In addition, the one time – since May, 2014 when Hill stopped making online payments and began mailing the payments to the Arizona office – that she sent the Association a check her father wrote from his bank account for the monthly Association fees rather than sending the Association a money order for the payment, they claimed they did not receive it and she was asked to send another one which she did not do because of the problems they had caused her with her bank account; because her father was bothered with writing a check directly to them; and because she had sent the payment certified and has proof of delivery records from the Post Office which includes a receipt signed for by the HOA.  She did though, send copies of the postal records to the Texas Office in September, 2015 upon their telling her that they needed proof of that payment but she has not heard from them and upon receiving the notice of collection from the Association's attorneys -  Ead, Murray and Pugh, P.C. – that has an account summary history attached to the letter, as mentioned in 21 below, she found that the July payment has not been listed on Ritter's account as paid and therefor is a part of the "debt" which includes attorney fees and management collection fees that they have notified Ritter they intend to collect through litigation.

22.                                                                                                                 S

ometime after March 11, 2016 Hill received the letter that the Association's attorneys sent Ritter notifying him of their intent to file a lawsuit unless he either pays the total amount specified in the letter or makes payment arrangements satisfactory to their client

which would include the disputed charge for the repair of the damaged siding and late fees for nonpayment of it; NSF fees for the unauthorized payments that were returned on April 17, 2014, the July payment they said they did not receive, but actually had received and attorney fees in the amount of $275.00 and a Management Co. collection fee in the amount of $95.00 for not having paid these charges. Within thirty days of their letter. Hill sent them a notice stating that Ritter/Hill disputes that they owe the above mentioned amount and listing specifically the above menttioned charges and requesting verification of the debt.

23.                                                                                      H

owever, because Hill is not the owner of the Condo and her brother has power of attorney over her father she has been informed by the law firm of the attorneys that the dispute notice and request for verification (or proof of debt) she sent the attorneys will not be considered and therefore she will not be receiving proof of the debt as requested. She has been the only family member taking care of and responding to the issues that the Association has raised since she has been living there, although she has discussed all of them with her father and no family member has objected.  And the person she spoke with acknowledged that she had been living at the condo and responding to the issues until this point but because her brother - not she – has power of attorney they will be communicating with him only.

24.                                                                                      A

s of this date Hill cannot get into the online account to check the status of the account of the account because the Association "locks the accounts after they are turned over to their attorneys so that the owner cannot make an online payment without paying the

attorney fees and management collection fees that are added to accounts that have been turned over to their attorneys for collection". nor has she discussed it with her brother who has met with the attorneys.

**Defendants violated 15 § U.S.C.1692e(2)**

25.                                                                                                                D

efendants, Bayside Woods, HOA Inc., Community Association Services of Indiana and their attorneys misrepresented this debt. Prior to Hill's paying the monthly Association fees online – during the months of December, 2014 through April, 2015 – through Autopay or mailing it to the Arizona Office as the Association requested she pay them rather than depositing a money order in the deposit box at the Carmel Office as she had previously done, the only past due balance on Ritter's account history was the charge for the repair of the damaged siding that Hill disputed Ritter was obligated to pay citing the obligations of the Association provided for in the Declaration which governs the obligations of both the homeowners and the Association. However, without citing *any provision* of the Declaration in support of its decision the Board sent Ritter an invoice for the CASI maintenance call to replace the siding damaged "by the heat of a BBQ grill"  and a letter simply stating "Since the issue was deemed "an owner responsibility" the Association is not responsible for payment of this service. The total amount due is $355.48…". Absolutely no basis was given to support this decision. The Association didn't state how it determined that the damage was caused by the heat of a BBQ grill or how the Associations obligation to keep up the siding of the buildings became Ritter's responsibility when he did not cause it nor did his family, families

friends, invitees, etc. which the Association does not dispute and clearly it was damaged before he purchased it.  As Hill stated she did not even believe the damage was caused by a grill but in any case she has not found any provision of the Declaration that supports the Board's decision that it can simply assess the cost of the repair to any owner of 6412 Bay Vista Court regardless of whether the owner, the owner's friends, guests, etc. caused the damage.

26.                                                                                                       T

he original charge that caused Ritter's account to have a past due balance – with the exception of the July, 2015 Association fee payment that was not listed on Ritter's account history – is the charge for the repair of the damaged siding and the obligation to cover the cost is governed by the Declaration.  And Hill disputed the charge citing the Declaration but without providing any reasonable basis or citations to the Declaration the Board determined a homeowner was responsible and charged Ritter's Account History for the damage to the side of the building in October 2012; added monthly late fees of $25 from November 2014 on to Ritter's account for failure to pay the special assessment; NSF fees for the two monthly payments that she obviously never authorized in April 2014; failed to list the July 2015 payment, added additional attorney fees and management collection fees to their Account History and then threatened to collect a past *due* balance of 1,330.50 despite that Ritter's has paid every monthly association fee assessment since he purchased the condo.  In order to have a debt there must be an agreement or contract that holds the debtor responsible and there is – the Declaration but the Association has never cited to it.  If they truly believed the cost to repair the damaged siding was "an owner's responsibility" and that the

Declaration supports it, it would seem that they would file a claim for a breach of contract to settle the issue rather than ignoring Hills disagreement and evidence that it isn't Ritter's obligation to take care of.  But there isn't anything in the Declaration the Associations decision so they began adding late fees and fees on what may be unsuccessful attempts to collect the balance through taking it from Hill's bank account. etc., and are now attempting to collect a "past due balance", calling it a "debt" instead. This is misleading and deceptive and in violation of the Fair Debt Collection Practices Act.

27.                                                                                                                    D

uring the time that the Association was sending letters notifying Ritter of the past due balance Hill assumed that the Association would have to file a lawsuit alleging a breach of contract because Hill's refusal to pay the disputed assessment could not be considered a debt until it was determined whether Ritter *was* actually breaching the contract by not reimbursing the Association for the cost to repair the siding.  She didn't see how the Association could just begin collection proceedings against Ritter and call this a "debt" without having provided any reasonable basis or citations to the Declaration for claiming that Ritter is obligated to pay the assessment and therefore late fees for not paying it. The Association is responsible for the upkeep of the outside of the buildings and they did repair the damaged siding as obligated to under the Declaration if it needed to be repaired.   If the Board truly thought though, that they had the right under the Declaration, to assess the cost of repair to Ritter it would seem they would have filed a breach of contract claim rather than trying to run up the balance and then collecting a

"past due balance" as a debt and provide the necessary evidence for proving this is the obligation of the owner. But they didn't and couldn't because there is nothing in the contract that supports that Ritter/Hill owe it. Hill had hoped to find out what legal basis the Association and their attorneys thought they had for assessing and attempting to collect the "debt" when it responded to her request for proof of the debt. But they will not be responding to her request for proof of the debt where Hill has stated specifically the portions of the "debt" that she and Ritter are disputing which includes the charge for the repair of the damaged siding.

28.                                                                                                          T

he attorneys representing the Association are obviously familiar with the Declaration and its provisions. They sent a letter to the homeowners in March, 2015 citing to Article's V, VI, X, XIV yet the Association has not cited a single provision for this assessment and the attorneys have now threatened Ritter stating: "If you want resolve this matter without a lawsuit, you must, within fifteen (15) days of this the date of this letter, either pay the total amount specified  above, or contact us at ...or by email at...and work out payment arrangements that are satisfactory to our client." Hill doesn't know what they could have provided her though, for *proof* of the debt. There has been no proof of debt established – just an "It's been deemed an "owner responsibility"", Therefore it appears they began adding late fees in the amount of $25 to the account for the unpaid special assessment two (2) years after the assessment was initially charged to Ritter's account and then waited until the account balance was well over the amount for the repair of the damaged siding. With the missing July, 2015 payment, NSF fees and attorney fees and management collection fees it appears this is nothing more than a past due balance or

"debt" they intend to collect.  That certainly takes the focus off of the Association's duty

to prove that Ritter owes the assessment that was charged to his account which is only in

the amount of $355.48 as they would have had the duty to do had they filed a claim of

breach of contract to collect the disputed assessment, the cost of which they say is

"binding upon you and the property that you own in that community" which it doesn't

appear the Association could do unless there is a provision that allows the Board to make

the random decision that they can assess the cost to Ritter regardless of whether Ritter or

his friends, family, etc. caused the damage because they failed to assess it to the owners

of record when the damage occurred.


**Defendants Paylease Web and the Community Association Services of Indiana**
**violated 15 §USC 1692f(1)**

29.                                                                                          D

efendants, Paylease Web and the Community Association Services of Indiana violated

15 §USC 1692f(1) when Paylease Web notified Hill by email on Aril 28, 2015 that the

two NSF fees that were deducted from her account on April 22, 2015 had been returned

to Paylease Web by her bank and then Paylease Web immediately again presented the

two fees to her bank to again be deducted from her account the following day – April

29, 2015   These fees were for the two April, 2015 homeowners association monthly

payments that she attempted to make but didn't confirm nor complete because the

computer would not let her pay any amount less than the full balance on her account

which she didn't intend to pay and that were returned to Paylease Web for insufficient

funds.  And the fees, although they were deducted from her account and paid to

Paylease Web, Chase also disputed them because she did not authorize them. Because Chase had disputed that she did not authorize them.  The NSF fees had been deducted from her bank account but were returned to Paylease Web for insufficient funds but she did not authorize the payments to be deducted from her account.  In fact she not only didn't confirm the payments but click on the next key to complete them because the web site wouldn't allow her to make payments of any amount less than the full balance which she didn't intend to pay.didn't close either one of them because the two payments she made for the April monthly assessment were returned to the payment for the return of the two April HOA payments that were deducted from her bank account on April 22, 2015 were returned  the two monthly April payments that were returned to them for insufficient funds had been returned to it by her bank. for the two monthly homeowners association payments for April, 2015 that Hill did not authorize and were returned to it for insufficient funds  after the  othat began deducting NSF fees on April 22, 2015 for the NSF payments returned to it from April 17, 2015 where neither the original payments nor the fees  were authorized to be deducted from her account and particularly when they sent her an email on April 29, 2014 notifying her that they were deducted and returned and then immediately on that same day attempted to deducted them again from her account after Chase bank had disputed that she authorized them and had them returned to her account.  Pay lease Web knew or should have known that they were not authorized because they would only have her email address from the email she sent them notifying them that she was not authorizing those payments.

30.                                                                                                                          1

4. Hill requests monetary civil penalties under the Fair Debt Collection Practices Act.

Respectfully Submitted

_Kristin S. Hill_

Kristin S. Hill

6412 Bay Vista Court

Indianapolis, IN  46250